COX, J.
This criminal appeal arises from the First Judicial District Court, Caddo Parish, Louisiana. Jeffery Lamar Brooks was charged with two counts of molestation of a juvenile, in violation of La. R.S. 14:81.2. After a jury trial, Brooks was found guilty of the responsive verdict of indecent behavior with a juvenile as to Count One and *528 guilty as charged to Count Two. Brooks was sentenced to serve five years at hard labor on both counts, to be served concurrently with each other. For the following reasons, Brooks's convictions and sentences are affirmed.
FACTS
Brooks was born on November 21, 1977. On October 1, 2013, Brooks was charged by bill of information with two counts of molestation of a juvenile, which allegedly occurred in 2003 and 2013 against separate victims. At arraignment, Brooks pled not guilty and elected to have a jury trial. On April 7, 2015, Brooks filed a motion to sever the offenses arguing that joinder of the offenses prejudiced his case, and any limiting instructions by the trial court could not overcome such prejudice. Brooks further stated that the mere allegation of another offense would color the jury's view of the facts, adding "[t]he jury will have insurmountable difficulty in distinguishing the alleged acts and would be more inclined to convict [Brooks] on a lesser standard of evidence on each count because of the cumulative effect of the evidence." A hearing was held on September 25, 2017, after which the trial court denied the motion.
Following the jury trial, Brooks was convicted of the responsive verdict of indecent behavior with a juvenile as to Count One and guilty as charged as to Count Two. Brooks subsequently filed motions for a new trial and post-verdict judgment of acquittal. Brooks's motions for new trial and post-verdict judgment of acquittal were denied by the trial court. That same day, without Brooks expressly waiving the sentencing delays under La. C. Cr. P. art. 873, the trial court sentenced Brooks to serve five years at hard labor as to both counts. The trial court ordered that the sentences run concurrently with each other and any other sentence Brooks may be serving.
Brooks and the district attorney filed motions to reconsider the sentence. There is no indication that the trial court ruled on Brooks's motion to reconsider sentence. However, the trial court denied the state's motion on November 27, 2017. This appeal followed.
DISCUSSION
Sufficiency of the Evidence
Brooks's first assignment of error is that the evidence was insufficient to support his convictions. Brooks argues that there was no physical evidence produced to establish his guilt on either charge. He contends the case was decided solely on the allegations of the victims and failed to support his convictions. Brooks emphasizes that the original investigation of the alleged 2003 offense was not pursued due to a lack of evidence. He asserts that the medical examination of the 2003 victim, T.W., following the alleged offense, produced no evidence of sexual abuse. He states that the 2003 case was only reopened due to the more recent allegations against him by the other victim, J.H. Brooks further argues that J.H. gave conflicting statements over the course of the investigation, casting doubt on her credibility. In response to this argument, the state argues that the testimony of a victim alone is sufficient to support a conviction if the jury finds that victim to be credible.
When sufficiency of the evidence and one or more other trial errors are raised on appeal, the reviewing court should first determine sufficiency of the evidence. La. C. Cr. P. art. 821. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, *529 could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. Hudson v. Louisiana , 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981) ; Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Dennis , 46,471 (La. App. 2 Cir. 9/21/11), 72 So.3d 968, writ denied , 2011-2365 (La. 5/18/12), 89 So.3d 1189.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson , supra ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Steines , 51,698 (La. App. 2 Cir. 11/15/17), 245 So.3d 224. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. Steines,supra .
The appellate court does not assess the credibility of witnesses or reweigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442 ; Steines,supra . A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. Steines,supra .
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is viewed, the facts established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton , 436 So.2d 471 (La. 1983) ; Steines,supra .
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Mingo , 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, writ denied , 2017-1894 (La. 6/1/18), 243 So. 3d 1064. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; Mingo,supra .
Under the Jackson rationale, when the defendant asserts that he was not the perpetrator, or remains silent, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Long , 408 So.2d 1221 (La. 1982) ; Steines,supra . It is the province of the fact finder to resolve conflicting inferences from the evidence. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness-if believed by the trier of fact-is sufficient to support the requisite factual conclusion. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence. This is equally applicable to the testimony of sexual assault victims. Steines,supra .
In 2003, at the time Count One occurred, La. R.S. 14:81(A) defined indecent behavior with a juvenile as:
the commission of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing *530 or gratifying the sexual desires of either person.
At the time that Count Two occurred in 2013, La. R.S. 14:81.2(A)(1) defined molestation of a juvenile as:
the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.
The evidence presented at trial is as follows:
The 2003 offense against T.W. was committed on December 22, 2003. T.W. testified that she was born on December 8, 1988, and that she met Brooks around December 2003, when he dated her sister, Tina. On December 22, 2003, T.W. was 15 years old and living at 6106 Canal Boulevard, Shreveport, Louisiana, with her mother, stepfather, and other sisters, Jan, Shanika, and Kiona. Tina did not live with T.W. and T.W.'s family in December of 2003, but T.W. frequently saw Tina and Brooks at her family home.
On December 22, 2003, T.W. was alone at her home when Brooks came over, allegedly looking for Tina. T.W. advised Brooks that Tina was not there, and Brooks asked to use the restroom. T.W. testified that the restroom was located directly across the hall from her bedroom. After Brooks emerged from the restroom, he told T.W. that he wanted to show her something in her bedroom. T.W. walked into her bedroom first and Brooks followed. Brooks pushed T.W. onto the bed and began to take off his pants. T.W. told Brooks "no" and began to cry. Brooks was standing over T.W., and after he took his pants off, he lay on top of her and inserted his penis into her vagina. Brooks proceeded to have sex with T.W., which lasted five to ten minutes.
Afterwards, Brooks got out of the bed, put on his clothes, and left the home. T.W. stated that she then took a bath. T.W. did not tell anyone, including her sisters and mother, about the rape because she was uncomfortable talking about it. T.W. added that she was afraid Brooks would hit her if she fought back. T.W.'s sister, Kiona, overheard T.W. telling her boyfriend on the phone about what happened. Kiona informed their mother of what she heard, which occurred two or three days after the rape. T.W.'s mother called the police, and T.W. was taken to a hospital to be examined by medical personnel. T.W. testified that nothing appeared to happen in the case following her exam until she was contacted by Sergeant Scott Mutter in 2013.
Sgt. Mutter came to T.W.'s home and asked her about the 2003 incident. T.W. noted that her sister, Tina, urged T.W. to not testify against Brooks. T.W. is no longer speaking to Tina and was informed by her other sisters that Tina and Brooks are still in contact.
On cross-examination, T.W. stated that she only saw Brooks in public after the incident and denied letting Brooks babysit her children. T.W. denied running away from home as a teenager; however, she did indicate that at some point, she snuck out of the home in the middle of the night and returned the following afternoon.
Tina testified that she was dating/living with Brooks in 2003, and they are still friends, speaking almost every day. Tina stated that she was unaware of the alleged *531 rape until 2006 or 2007. According to Tina, Brooks had previously visited the home at 6106 Canal Boulevard, and it was not uncommon for Brooks to drop her off at the home or visit her family.
Several months before the trial, Tina contacted T.W. and her other sisters, asking their opinion on whether she should begin dating Brooks again. Tina testified that T.W. indicated she did not have a problem with Tina and Brooks dating. Tina also stated that she contacted T.W. after she was served with a subpoena to testify in the current trial. Tina denied trying to pressure her sister from testifying, stating that she wanted T.W. to tell the truth. Tina added that she and T.W. shared an apartment for a period of time after the incident, and that Brooks would visit the sisters at their apartment and play with their respective children. Tina testified that T.W. had previously run away from home when she was either 14 or 16 to be with a boy and was gone for about three to four days. Tina further testified that in December 2003, Brooks was living in Texas and was in Dallas on the day of the alleged offense.
Sergeant Paula Farquhar testified that she works in the Shreveport Police Department sex crimes unit and was assigned to T.W.'s case on December 29, 2003. Sgt. Farquhar made contact with T.W.'s mother to schedule a medical exam and interview with T.W. for the following day. T.W. told Sgt. Farquhar that on the day of the rape, she was at 6106 Canal Boulevard with other children and talking to her boyfriend on the phone when Brooks arrived. Someone from church picked up the other children, but T.W. could not go because she was "in trouble that day." T.W. got off the phone with her boyfriend because it needed to be charged, but she told her boyfriend that Brooks made her nervous because he would touch her leg and make inappropriate comments. T.W. advised Sgt. Farquhar that Brooks attempted to kiss her, but she refused. Brooks took T.W. into a bedroom and told her to disrobe. When T.W. refused, Brooks took off his pants, moved her underwear over to expose her vagina, and inserted his penis into her vagina. T.W.'s mother informed Sgt. Farquhar that she learned of the rape from someone other than T.W, but T.W. later confirmed what had happened.
On February 11, 2004, Sgt. Farquhar also spoke to T.W.'s step-father and Tina on the phone. The stepfather did not provide any useful information, and Tina was uncooperative. Sgt. Farquhar made several unsuccessful attempts to locate Brooks. Sgt. Farquhar was told by Brooks's employer, Payless Shoe Store, that Brooks had gone to Dallas, Texas, in response to some emergency. Payless refused to provide additional assistance. T.W.'s boyfriend made an appointment to speak with Sgt. Farquhar, but did not keep the appointment.
Sgt. Farquhar testified that during the course of the investigation, T.W.'s mother stopped responding to her calls. As a result of her lack of cooperation and Sgt. Farquhar's inability to locate and interview Brooks, the investigation was suspended. In 2013, Sgt. Farquhar supervised Sgt. Mutter's investigation into J.H.'s sexual assault and based on the similarities between T.W.'s and J.H.'s cases, she and Sgt. Mutter determined the assaults were committed by the same man. T.W.'s case was subsequently reopened. Sgt. Farquhar added that no physical evidence was collected from T.W.'s home during the original investigation because too much time had passed between the incident and the case being reported. Consequently, the possibility of collecting credible physical evidence was very small.
*532 Sgt. Mutter testified that he interviewed T.W. to confirm that the suspect in J.H.'s case was the same individual who assaulted her in 2003. Sgt. Mutter stated that T.W. was very emotional and that she had always wondered why the case was never pursued. T.W. relayed the facts of her case to Sgt. Mutter and stated that she wanted to cooperate with the investigation. When Sgt. Mutter showed T.W. a photograph of Brooks, T.W. immediately recognized Brooks as the man who raped her in 2003. Sgt. Mutter arrested Brooks for the crimes against J.H. and T.W.
Jansequa, T.W.'s sister and witness for the defense, testified that she was unaware of her sister's alleged rape until 2016, when the case was reopened. Jansequa stated that she was shocked by the accusation and had viewed Brooks as an older brother. Jansequa added that in 2003, T.W. left the family home in the middle of the night to see her boyfriend, but T.W. returned the following afternoon. It is unclear from her testimony what day or month T.W. left the home to be with the boyfriend. Shanika, T.W.'s other sister, also testified that she did not learn of the alleged rape until 2016. Shanika corroborated Jansequa's testimony about T.W. leaving the family home one night and returning the following day.
The second offense was committed on July 24, 2013, against J.H. J.H. testified that she was born on February 18, 1999, and that she met Brooks when he began dating her mother. Brooks and J.H.'s mother had been dating for less than a year when Brooks moved into J.H.'s home located at 762 Bayou Lane, Shreveport, Louisiana, in June 2013. J.H. stated that her parents were no longer together, and prior to the incident, she lived in between her parents' homes. At the time of the offense, however, she and her siblings, two brothers and one sister, were living with their mother and Brooks. According to J.H., on July 24, 2013, she was molested by Brooks in the home's living room. J.H. testified that she was 14 years old when the offense occurred and her brother, B.H., was present. B.H. was 5 years old at the time.
J.H. stated that she was lying on the living room sofa, Brooks was sitting on the floor in front of the sofa to her right, and B.H. was sitting on the floor to her left. The three of them were watching television when Brooks started fiddling with J.H.'s fingers and rubbing her hands. Brooks began to rub J.H.'s arms and placed his hand down her shirt and rubbed her breasts. Next, Brooks put his hand down J.H.'s pants and inserted his finger into her vagina. Brooks later asked J.H. if he could look "down there," i.e. her vagina, and J.H. refused.
J.H. texted her mother, who was at work, that Brooks had molested her. J.H.'s mother came home and called the police. The police came to their home, and J.H.'s mother took her to the hospital, where J.H. was examined by medical staff, who took body samples and also collected J.H.'s clothes. Approximately a week after the offense, J.H. was interviewed at the Gingerbread House and recounted the events of July 24, 2013. J.H. added that although Brooks had never molested her before, he had previously made statements which made her feel uncomfortable.
The Gingerbread House video depicts J.H. being interviewed by Jennifer Flippo at the Gingerbread house. During the video, J.H. clearly identifies Brooks as her molester and relates the same information as in her testimony, adding that at some point, her brother left the room to get a blanket, and Brooks kissed her. J.H. said that Brooks told her that he loved her and asked whether she loved him. J.H. said she shook her head. Brooks asked if J.H. was *533 "mad at him," and she again shook her head. J.H. also stated that Brooks would stop touching her if her brother looked in their direction. After Brooks touched her, Brooks offered to have J.H.'s fingernails painted; J.H. believed Brooks was attempting to bribe her. J.H. stated that she texted her mother after the incident and told her that Brooks had touched her inappropriately. J.H.'s mother then called J.H., but J.H. did not answer the phone because she did not want Brooks to know that she told her mother about what happened.
On cross-examination, J.H. stated that she did not inform her father of the offense until 2017, when investigators handling the case were trying to locate her. J.H. testified that during the incident, she did not scream or slap Brooks's hand away. Rather, she tensed up. J.H. denied knowing Brooks's other alleged victim, T.W., and stated that she only saw T.W. briefly at the courthouse.
Trooper Jarrod Miles, an officer with the Louisiana State Police, testified that he was dispatched to 762 Bayou Lane at approximately 4:00 p.m. on July 24, 2013, in response to an alleged sexual assault. Upon arriving at the home, Trooper Miles made contact with J.H.'s mother, who advised him that J.H. had been assaulted by Brooks. Trooper Miles testified that J.H. and her mother were the only individuals at the home when he arrived. J.H. appeared upset but her clothing was not disheveled, ripped, or torn. Trooper Miles interviewed J.H. with her mother present and learned that the alleged offense occurred around 2:00 p.m. that day. J.H. related the details of the incident to Trooper Miles, which corroborated J.H.'s earlier testimony, adding that the incident lasted about three or four minutes. J.H. also told Trooper Miles that after Brooks inserted his finger in her vagina, Brooks asked her whether she wanted him to stop, and she said "yes." J.H. advised Trooper Miles that her brother was present during the incident, but he was paying attention to the television.
Trooper Miles was given Brooks's cell phone number and called Brooks to schedule an interview. Brooks told Trooper Miles that he was on his way to the 762 Bayou Lane home, but he never showed up. Trooper Miles then notified his supervisor of his findings, and Sgt. Mutter was assigned to the case. J.H. was transported to the hospital by her mother. Trooper Miles remained with J.H. and her mother until Sgt. Mutter arrived. Trooper Miles wrote a report, which concluded his involvement in the case.
Ms. Flippo testified that she conducted J.H.'s forensic interview at the Gingerbread House on July 30, 2013. Ms. Flippo stated that J.H. was accompanied by her mother to the Gingerbread House, but her mother was not present during the interview. Sgt. Mutter and Nate Veal, who works with Child Protective Services, observed the interview on a closed-circuit monitor in a separate room.
Fonda Partner testified that she was working at Louisiana State University Hospital in Shreveport, Louisiana, on the evening of July 24, 2013, when J.H. was brought in to be examined for a possible sexual assault. Partner, a qualified sexual assault nurse examiner ("SANE"), performed the examination using a physical exam recovery kit ("PERK"), and filled out a form detailing her findings. Prior to the exam, J.H. told Ms. Partner about the incident, again relaying that Brooks molested her while she, Brooks, and her brother were watching television in the living room. Ms. Partner took swabs from J.H.'s mouth, breast, and vaginal area and observed abrasions to J.H.'s vagina. Ms. Partner also utilized a special dye test that indicates whether an abrasion is fresh. The *534 dye test revealed two recent abrasions to the exterior of J.H.'s vagina.
Further examination showed that one of the abrasions continued into J.H.'s vaginal cavity. Ms. Partner testified that J.H.'s injuries were consistent with sexual assault. Ms. Partner noted that J.H. was quiet during the examination and made good eye contact, but she was not agitated, crying, anxious, or angry. Ms. Partner further testified that she believed the injuries were inflicted within hours of or a day before the examination. Ms. Partner admitted that the abrasions could have been caused by a penis or knuckle and were consistent with J.H.'s story, but they could also have possibly resulted from masturbation, "depending on what you're talking about."
Next, Michelle Vrana testified that she was working as a technical supervisor for the North Louisiana Crime Lab when Sgt. Mutter brought items to the lab for testing. According to Ms. Vrana, Sgt. Mutter provided three items of evidence for testing: a sealed plastic bag containing a small box with two buccal swabs taken from Brooks (Item 1), a sealed PERK kit taken from J.H. (Item 2), and reference samples that were removed from J.H.'s PERK kit (Item 3).
Dr. Candace Jones performed the actual DNA test, but she no longer works for the lab. An analysis of Item 2, the PERK kit, revealed no male DNA; therefore, Dr. Jones determined that analysis of Items 1 and 3 were unnecessary. Item 2, the swabs taken from J.H.'s breasts and fingernails, were not tested for DNA because, per Ms. Vrana, there was no reason to believe that there would be DNA on them. Item 2C, the right abdomen swab, tested negative for semen and male DNA. Similarly, Item 2F, two external genitalia swabs taken from J.H., and Item 2G, two perineal swabs taken from J.H., also tested negative for semen or male DNA. Ms. Vrana stated that an absence of DNA on the swab does not signify whether a sexual assault occurred. Rather, it simply indicates that no DNA was collected on the swab. Ms. Vrana testified that as technical supervisor, she reviewed Dr. Jones' report after the DNA testing in this case was complete.
Sgt. Mutter testified that he was assigned to J.H.'s case on July 24, 2013, and made contact with Trooper Miles, J.H., and her mother at the hospital. When Sgt. Mutter met J.H., she appeared very quiet and kept her head down. Sgt. Mutter testified that J.H.'s previous statement to Trooper Miles was sufficient to begin an investigation, and he avoided asking J.H. additional questions. Sgt. Mutter interviewed J.H.'s mother, who appeared very upset and shocked by the incident.
On July 25, 2013, a day after the incident, Sgt. Mutter questioned Brooks and advised him of his Miranda rights, which Brooks waived. Brooks denied touching J.H. in any type of manner and consented to providing a DNA sample. Despite this consent, Brooks voiced concerns about DNA being transferred from him to J.H. because they lived in the same household and he shared towels, etc., with other members of the family.
After the interview, Sgt. Mutter determined that Brooks had previously been a suspect in T.W.'s sexual assault case. Sgt. Mutter stated that based on the report in T.W.'s case, he determined that Brooks was the same individual he had interviewed in J.H.'s case. Sgt. Mutter also testified that he attended and watched J.H.'s Gingerbread House interview through the facility's closed circuit television system.
We find there was sufficient direct evidence to convict Brooks of both offenses.
*535 The testimony of T.W. alone is sufficient evidence that Brooks is guilty of indecent behavior with a juvenile. At the time of the offense in 2003, T.W. was 15 years old and Brooks was approximately 26 years old. T.W. clearly stated that Brooks pushed her onto the bed and forced her to have nonconsensual sex for his own sexual gratification. By convicting Brooks of the responsive charge of indecent behavior with a juvenile, it appears that the jury had some concerns about what exactly happened between T.W. and Brooks in December of 2003, but not enough to acquit Brooks of the offense.
Similarly, there was sufficient evidence to support Brooks's conviction for the molestation of J.H. Again, the testimony of J.H. alone is sufficient to uphold Brooks's conviction. J.H. testified that when the offense occurred, Brooks was babysitting her and her brother while her mother was at work. J.H. stated that Brooks kissed her and touched her breasts and vagina against her will. Defense counsel's claims that there were inconsistencies to J.H.'s testimony regarding the placement of her brother, who did not observe the offense, does not amount to irreconcilable conflict of the facts or inconsistent statements. The crux of J.H.'s testimony, that Brooks forcibly molested her, remained consistent as she repeatedly relayed to Trooper Miles, Nurse Partner, and Jennifer Flippo what had happened to her. Furthermore, the physical evidence collected in J.H.'s case corroborates her testimony. Nurse Partner testified that the abrasions to J.H.'s vagina occurred within the past several hours or day, which is consistent with when J.H. stated the assault happened. Additionally, the abrasions were also consistent with a sexual assault. J.H. was 14 years old in 2013, and Brooks was approximately 36 years old.
As the jury's decision was reasonably based on a credibility call, Brooks's convictions are not disturbed on appeal. This assignment is without merit.
Severance of Charges
Brooks argues that severance of the two charges, which involved separate victims, was warranted and failure to sever the charges prejudiced Brooks's defense. Specifically, Brooks claims that the state intentionally joined the two charges of molestation of a juvenile to imply that Brooks possesses a criminal disposition, to confuse the issues, and create a hostile jury. Brooks further argues that the state joined the charges to disguise the weak evidence of each allegation and, thus, deprived Brooks of a fair trial.
The state argues that joinder of the offenses is permissible as they are of the same or similar character and are triable by the same mode of trial. The state also contends that Brooks fails to offer any factual evidence to support his allegations that the joinder is prejudicial.
La. C. Cr. P. art. 493, which governs the joinder of offenses, provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
La. C. Cr. P. art. 495.1 provides:
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate *536 trials, grant a severance of offenses, or provide whatever other relief justice requires.
Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm , 446 So.2d 729 (La. 1984) ; State v. Robinson , 49,677 (La. App. 2 Cir. 4/15/15), 163 So.3d 829, writ denied , 15-0924 (La. 4/15/16), 191 So.3d 1034. To determine whether severance should be granted, the trial court must decide whether, in view of the number of offenses charged and the complexity of the evidence, the finder of fact can distinguish the evidence and apply the law intelligently to each offense. State v. Coleman , 369 So.2d 1286 (La. 1979) ; State v. Robinson,supra .
The burden rests upon the defendant to demonstrate prejudicial joinder. State v. Machon , 410 So. 2d 1065 (La. 1982) ; State v. Calhoun , 51,218 (La. App. 2 Cir. 4/5/17), 216 So. 3d 1101, writ denied , 2017-1029 (La. 3/9/18), 238 So. 3d 453. To determine if a defendant is prejudiced by the joinder of two offenses, the district court must examine whether (1) the jury would be confused by the various counts, (2) the jury would be able to segregate the various charges and evidence, (3) the defendant would be confounded in presenting various defenses, (4) the crimes charged would be used by the jury to infer criminal disposition on part of defendant, and (5) considering the charges, the jury would be hostile toward the defendant. State v. Robinson,supra ; State v. Calhoun,supra . The court, however, must also weigh the possibility of prejudice to the defendant against "the important consideration of economical and expedient use of judicial resources." State v. Brooks , 541 So. 2d 801 (La. 1989) ; State v. Calhoun,supra . A motion to sever is within the sound discretion of the trial court, and, absent a showing of abuse of discretion, the court's ruling should not be disturbed on appeal. State v. Williams , 418 So. 2d 562 (La. 1982) ; State v. Calhoun,supra .
In State v. Washington , 36,224 (La. App. 2 Cir. 9/18/02), 828 So.2d 97, writ denied , 02-2963 (La. 9/19/03), 853 So.2d 631, the defendant was arrested for the rapes and the robberies of three different women and the indecent behavior of requiring two of the women's children to watch the rapes. The defendant was charged with three counts of aggravated rape, two counts of armed robbery, one count of aggravated sexual battery, and two counts of indecent behavior with juveniles. The defendant was convicted of eight of the nine counts.
On appeal, the defendant challenged the joinder of the offenses. This Court affirmed the convictions, noting that the court had previously upheld the joinder for trial of separate charges for the rapes of separate victims. See State v. Harris , 33,406 (La. App. 2 Cir. 8/25/00), 765 So.2d 1230, writ denied , 00-2868 (La. 8/24/01), 795 So.2d 322. This Court found the presentation of the evidence chronologically and separately for each victim to be sufficient to prevent confusion of the issues. This Court also observed that the lack of confusion is evident from the jury acquitting the defendant of one charge. State v. Washington,supra .
Brooks fails to show that the trial court abused its discretion in denying his motion to sever the charges. As previously stated, a hearing on the motion to sever the charges was held prior to the commencement of trial on September 25, 2017. Defense counsel argued at the hearing that the facts of each offense are too dissimilar to constitute signature crimes and the nature of the charges would likely arouse jury hostility. Counsel further argued that even if joinder of the charges was permissible, the trial court should still sever the charges to prevent Brooks's case *537 from being prejudiced and the jury from inferring a criminal disposition.
In contrast, the State argued at the hearing that under La. C. E. art. 412.2, the jury would be privy to Brooks's prior similar offenses, adding that the similarities between the offenses and the judicial economy of trying the offenses together rendered joinder appropriate.
In denying the motion to sever the offenses, the trial court simply stated that it "finds that the case-the two cases, which are both molestations of a juvenile, meet the statutory requirements and that the State has the right to try them both together based upon the statute[.]"
The facts show that Brooks did not suffer undue prejudice from the joinder. First, the crimes were properly joined because they were triable by the same mode of trial and involved similar lewd sexual conduct involving two minor victims. As noted by the State during the hearing, the victims were both adolescent African American females whom Brooks gained access to via romantic relationships with relatives of the victims. Second, despite these similarities, the facts of each case are distinguishable from each other. The crimes occurred ten years apart and the evidence presented to the jury was not complex, allowing the jury to segregate the charges and evidence.
Recently, in State v. Calhoun,supra , this Court held the joinder of 19 charges, all of which involved various sexual offenses against minor children, to be permissible. This Court noted that the jury, by acquitting the defendant of some charges, demonstrated that it was able to clearly distinguish between the charges and were not hostile towards the defendant. Similarly, the jury in this case demonstrated its ability to separate the two offenses by finding Brooks guilty of the responsive verdict of indecent behavior with a juvenile as to Count One, but guilty as charged as to Count Two. This assignment is without merit.
Excessive Sentences
Brooks argues that sentencing him to serve five years at hard labor without the benefit of probation, parole, or suspension of sentence as to each count is excessive. Brooks complains that the trial court did not order a presentence investigation report or comply with La. C. Cr. P. art. 894.1 by considering aggravating and mitigating factors prior to Brooks's sentencing.
The State filed a motion to reconsider sentence at the trial court, arguing Brooks's sentences are lenient and asked the trial court to increase the length of sentence on both counts. On appeal, the State argues that Brooks's sentences are not excessive and requests they be affirmed.
At the time Brooks committed the first offense in 2003, indecent behavior with a juvenile was punishable by a fine of not more than $5,000.00, or imprisonment with or without hard labor for not more than seven years, or both. La. R.S. 14:81(C).
Molestation of a juvenile is punishable by five to ten years' imprisonment, with or without hard labor, or a fine of not more than $5,000.00, or both. La. R.S. 14:81.2(B)(1).
An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects he adequately considered the guidelines of the article. State v. Smith , 433 So.2d 688 (La. 1983) ;
*538 State v. Garner , 52,047 (La. App. 2 Cir. 6/27/18), 250 So.3d 1152. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Jones , 398 So.2d 1049 (La. 1981) ; State v. Ates , 43,327 (La. App. 2 Cir. 8/13/08), 989 So.2d 259, writ denied , 08-2341 (La. 5/15/09), 8 So.3d 581. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, and employment record), prior criminal record, the seriousness of the offense, and the likelihood of rehabilitation. There is no requirement that specific matters be given any particular weight at sentencing. State v. Taves , 03-0518 (La. 12/03/03), 861 So.2d 144 ; State v. Garner,supra .
Second, a sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith , 01-2574 (La. 1/14/03), 839 So.2d 1 ; State v. Garner,supra . A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Garner,supra .
The trial court has wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed will not be set aside as excessive absent a manifest abuse of that discretion. State v. Williams , 03-3514 (La. 12/13/04), 893 So.2d 7 ; State v. Scott , 50,920 (La. App. 2 Cir. 11/16/16), 209 So. 3d 248, writ denied , 2017-0353 (La. 11/13/17), 229 So.3d 478. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Williams,supra ; State v. Free , 46,894 (La. App. 2 Cir. 01/25/12), 86 So.3d 29.
Prior to his sentencing, Brooks elected to make a statement maintaining his innocence of both charges and vowing to advocate against all types of abuse, be it verbal, domestic, or sexual. Upon sentencing Brooks, the trial court noted that the offenses involved separate minor victims who did not know each other and that the offenses had occurred several years apart. The trial court further stated that it believed there was a likelihood that Brooks would reoffend and a lesser sentence on both counts "would not make the convictions effective." Importantly, the trial court took into account Brooks's statement, finding that Brooks had expressed no remorse for his actions. Brooks was then sentenced to serve five years at hard labor on both counts to be served concurrently with each other. Brooks was also given credit for time served.
The sentences imposed are not unconstitutionally excessive. The trial court adequately considered the La. C. Cr. P. art. 894.1 factors; thus, a satisfactory factual basis for the sentences imposed is shown on the record. Furthermore, the sentences imposed are not grossly disproportionate to the offenses committed. Brooks's five-year sentence for indecent behavior with a juvenile is a midrange sentence that is justified by the facts of the case. Similarly, Brooks's five-year sentence for molestation of a juvenile is the lowest possible sentence he could have received without the trial court deviating from the minimum permissible sentence. This assignment is without merit.
Error Patent
The record reveals that the trial court failed to observe the sentencing delays *539 under La. C. Cr. P. art. 873, and there is no express waiver of those delays in the record. La. C. Cr. P. art. 873 provides, in pertinent part:
If a defendant is convicted of a felony, at least three days shall elapse between the conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
Brooks has not objected to the trial court's failure to observe the delay, and there was no showing of prejudice. Thus, the trial court's failure to observe the statute was harmless error. See State v. Lindsey , 50,324 (La. App. 2 Cir. 2/24/16), 189 So.3d 1104.
CONCLUSION
For the foregoing reasons, Brooks's convictions and sentences are affirmed.
AFFIRMED.