Judgment rendered January 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,269-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                           Appellee

versus

PATRICK AARON CONLEY                         Appellant

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 75,690

Honorable Bruce E. Hampton, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Peggy J. Sullivan

JOHN FITZGERALD BELTON               Counsel for Appellee
District Attorney

TRACY WAYNE HOUCK
LEWIS ALLEN JONES
MICHAEL R. SMITH
Assistant District Attorneys

* * * * *

Before STEPHENS, ROBINSON, and ELLENDER, JJ.

**ELLENDER, J.**

Patrick Aaron Conley was convicted by a unanimous jury of multiple sex crimes perpetrated against his wife, including second degree rape, second degree sexual battery, sexual battery, aggravated second degree battery, and domestic abuse battery-child endangerment. Following his convictions, Conley was sentenced to a total of 95 years at hard labor. He now appeals both his convictions and sentences alleging the evidence presented was insufficient, the trial court erred in excluding two witnesses, and the sentences imposed were unconstitutionally excessive. For the reasons expressed, we affirm.

## FACTS

Conley met KC,[1] who was 19 years old at the time, when she was a customer at a store where he was working in Ruston called Pack and Mail. Even though Conley was around 20 years older the KC, they began dating and ultimately got married in 2010. Not long thereafter, KC discovered she was pregnant and gave birth to their first child, followed a few years later by their second child. Conley also had two daughters prior to the marriage, the younger whom KC adopted.

Soon after the birth of their first child, KC said Conley started to become very possessive, isolating her from others and forcing her to do things against her will. Conley would get angry, repeatedly accusing KC of talking to other men, though she denied it. He would also get mad if he believed KC was not doing things he expected her to, or failed to act in ways he desired. KC claimed Conley said he needed to "break her" because she

---

[1]KC is referred to by her initials since she was the victim of sex crimes. *See* La. R.S. 46:1844(W).

was a defiant wife, resulting in her being punished with physical and sexual abuse throughout their marriage. In addition to being slapped, cut, beaten, and bruised, KC claimed Conley used nonconsensual deviant sexual behavior as a form of punishment. Their sex life became rough and disturbing, devolving into various forms of role play, bondage, and the use of sexual objects such as leather collars, cuffs, butt plugs, costumes, and aids. Some of the more extreme and violent nonconsensual sexual encounters form the basis of Conley's crimes. The facts and circumstances of these incidents are largely drawn from the accounts given by KC.[2] Conley denies each accusation made, claiming their abnormal sexual behavior was all consensual, and was actually the result of KC's own deviant sexual desires.

Conley, a physically imposing muscular white male, was the fire chief for the town of Grambling and KC, a 5-foot-2, 110-pound white female, said he often used this position of authority to his advantage throughout their marriage. KC claimed Conley made numerous death threats, including telling her he could kill her with a ball-peen hammer by hitting the right spot on her neck, making it look like an accident because of his medical knowledge; he could push her down the stairs, making it appear to be an accident; and, with his knowledge of fires, he could burn down the house with her in it without getting caught. Conley claimed he knew cops, judges, and senators, and they would not believe her if she ever tried to report him. KC also believed Conley was tracking her movement when they were not together with GPS in her car and through her phone. KC lived under the

_____

[2] KC and Conley both testified at trial.

2

duress of these general threats most of their ten-year marriage, believing if she ever tried to leave, he would kill her. Conley also threatened if she left and he did not kill her, he would prevent her from having any contact with their children.

The incidents forming the factual basis for Conley's convictions began in 2019. KC claimed that in February of that year the gas bill became due at their residence and she asked Conley for money to pay it, but he refused and their gas was shut off. Conley became angry and ignored KC for several days, one of which was their anniversary, telling her he was thinking of an appropriate punishment. Ultimately, Conley had KC lie on the bed completely naked and pick a belt for him to hit her with. He then struck her ten times in spite of her pleas to stop, at one point switching to a belt with rhinestones that broke and scattered during the beating. KC claimed Conley said he hit her ten times because it was their tenth wedding anniversary. KC said Conley took his time to ensure each mark made with the belt was in a symmetrical pattern. KC was cut multiple times during this incident and her blood covered the sheets, but she refused to call the police because of the many death threats Conley had previously made and because of what he told her about being well connected, thus no one would believe her.

Also, in 2019, KC said Conley carved the letter "A" into her lower back. Conley, who went by his middle name "Aaron," first bit her skin off then used an X-acto knife to cut "A" into her body. KC remarked the pain was unbearable but she could not scream and had to bite a towel during this "carving" because Conley had informed her if she resisted, he would cut her more. The record is unclear whether this happened in January or August of

3

2019; however, KC was clear about the details of what actually occurred and that it did take place in 2019. For clarity, this incident will be described as having occurred in August 2019. Later that year, in December 2019, KC claimed Conley bit her, pulled her hair, and raped her.

On February 19, 2020, in an attempt to punish KC for what she believed was failing to answer the phone, KC said Conley bound her to their coffee table, naked, using zip ties. Prior to being constrained, Conley instructed KC to "get right," which meant for her to put on high heels and a leather collar around her neck, as well as leather cuffs on her ankles and thighs. While tied down, Conley placed a bag over KC's head, inserted a butt plug into her anus, and beat her with a spoon, as well as with his hand, on her vagina. He also wrapped his arms around KC's neck and choked her, causing a loss of consciousness and control of bodily fluids, an act which KC said occurred frequently throughout their marriage.

In December 2020, KC claimed Conley grabbed her, raped her, and told her that when she was weak, it made him feel strong and more like a man.

Finally, on the night of April 20, 2021, KC said she was taking a bath prior to bed when Conley became aggravated and accused her of having an affair. He continued to yell at her so she informed him she was going downstairs, but Conley would not allow it and, after some wrestling, he grabbed her in a bear hug and would not let her go. KC knew she could not get away, so she lay with him in bed and they fell asleep. At some point that evening, Conley attempted to force KC to perform oral sex by grabbing her head and pushing it toward his pelvic region, until KC complied with his demand. Either during the wrestling, or when she was forced to perform

4

oral sex, KC's lip was busted.  KC also claimed Conley ripped her clothes off, got on top of her, held her arms down, and forced her to engage in vaginal sex.  After these incidents, KC said she just could not take it anymore and decided to finally leave Conley, in spite of his many threats.

The next morning, after she brought the children to school, KC came back home thinking Conley would be gone for work and that she could get her and the children's things ready to leave, but he was still there.  She then gave Conley her wedding ring and told him she was done.  When she attempted to run out of the house to get away from him, Conley blocked her from leaving through both the front and rear doors, so she ran upstairs, locked herself in the bathroom, and called the police.  Conley ultimately unlocked the bathroom door with a coat hanger, but left after realizing the police were on their way.

Officer Brian Davis with the Ruston Police Department arrived shortly thereafter on the morning of April 21 and found KC to be very emotional, with shaky hands and an injured lip.  Conley was no longer at their home when the police arrived.  After brief questioning, Ofc. Davis took KC to the hospital to be evaluated, but a PERK[3] was not administered.  The nurse who examined KC told officers the kit was not used because it had been several hours since the alleged sexual encounter, and KC had cleaned herself prior to arriving at the hospital.  Later that day, Conley was taken into custody.

---

[3] PERK is an acronym for Physical Evidence Recovery Kit, used to collect biological evidence from victims of sexual assault.

# PROCEDURAL HISTORY

Conley was originally charged by bill of indictment with nine separate offenses: four counts of second degree rape, three counts of second degree sexual battery, one count of aggravated second degree battery, and one count of domestic abuse battery-child endangerment. The bill was later amended to strike one of Conley's charges of second degree rape and two of his charges of second degree sexual battery, as well as to amend the dates of some of the counts. As such, Conley stood trial on a six-count indictment, including: count 1, domestic abuse battery-child endangerment, La. R.S. 14:35.3(A) & (I), occurring on or about April 20, 2021; counts 2, 3, and 4, second degree rape, La. R.S. 14:42.1, occurring on or about April 20, 2021, February 19, 2020, and December 19, 2020; count 5, second degree sexual battery, La R.S. 14:43.2, occurring in December 2019; and count 6, aggravated second degree battery, La. R.S. 14:34.7, occurring in February 2019, August 2019, and February 2020. For count 6, the amended bill of indictment has a typewritten date of February 19, 2020, then also includes handwritten dates of February 2019 and August 2019.[4]

Jury trial commenced on March 28, 2022, and Conley was ultimately found guilty as charged, except for one count of second degree rape, occurring on December 19, 2020, to which the jury found him guilty responsively of sexual battery.

---

[4] Curiously, the state chose to charge only one count, as opposed to three separate offenses. As discussed later in this opinion, any of these three separate incidents provided an adequate factual basis for aggravated second degree battery.

**SENTENCING**

On July 12, 2022, Conley appeared for sentencing. At the hearing, the trial court first noted its review of the presentence investigation report and the statements made by KC and Conley prior to sentencing. The trial court opined it had found KC to be "extremely credible" and found Conley to have no credibility at all. The trial court further articulated this was a textbook domestic abuse case where Conley had exercised dominance, power, and control over KC while keeping her in isolation. It also emphasized the jury had determined there was no consent by convicting him of these heinous crimes.

Following a thorough compliance with La. C. Cr. P. art. 894.1, Conley was sentenced, at hard labor and consecutively, to 30 years each for both counts of second degree rape, 12 years for second degree sexual battery, 12 years for second degree aggravated battery, and eight years for sexual battery. For his domestic abuse battery conviction, Conley was sentenced to the six-month maximum in the parish jail, to run concurrently with a three-year maximum hard labor sentence for the child endangerment portion of the conviction, and consecutively with the other sentences. Conley's sentences totaled 95 years at hard labor, with 80 years to be served without benefits. Following sentencing, Conley filed this motion to appeal both his convictions and sentences. A motion to reconsider sentence was not filed.

**DISCUSSION**

*Sufficiency of the Evidence*

Conley challenges the sufficiency of the evidence for all of his convictions. The standard of appellate review for sufficiency of the evidence to uphold a conviction is whether, after reviewing the evidence in

7

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Moody*, 50,001 (La. App. 2 Cir. 9/30/15), 178 So. 3d 1031; *State v. Gilliam,* 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied,* 02-3090 (La. 11/14/03), 858 So. 2d 422. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. It is the province of the fact finder to resolve conflicting inferences from the evidence. *State v. Brooks*, 52,249 (La. App. 2 Cir. 9/26/18), 256 So. 3d 524; *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness—if believed by the trier of fact—is sufficient to support the requisite factual conclusion. *Id.* Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence. *Id.* This is equally applicable to the testimony of sexual assault victims. *Id.*

Conley addresses his convictions separately and claims the evidence presented by the state for each count was insufficient.

*Count 1: Domestic Abuse Battery-Child Endangerment, on or about April 20, 2021.*

Conley was convicted of domestic abuse battery-child endangerment from the incident on April 20, 2021, when he wrapped his arms around KC in a bear hug and would not let her go, pulled her hair, injured her lip, and forced her head toward his pelvic region. Conley concedes domestic abuse battery is the intentional use of force or violence, but argues such intent was not present here as he did not forcibly grab and hug KC, he "accidently" pulled her hair, and, if he did injure her lip, which he does not recall, it was unintentional. He claims the oral sex he had with his wife that night was consensual and not the result of him forcing KC's head toward his pelvic region. Conley also submits the children were downstairs during the incident and did not hear or see anything.

La. R.S. 14:35.3 provides, in pertinent part:

A. Domestic abuse battery is the intentional use of force or violence committed by one household member or family member upon the person of another household member or family member.

\*\*\*

I. This Subsection shall be cited as the "Domestic Abuse Child Endangerment Law". Notwithstanding any provision of law to the contrary, when the state proves, in addition to the elements of the crime as set forth in Subsection A of this Section, that a minor child thirteen years of age or younger was present at the residence or any other scene at the time of the commission of the offense.

On the night of April 20, in addition to nonconsensual oral and vaginal sex, Conley used force and violence against KC in a number of ways: (1) pulling her hair and busting her lip, (2) wrapping his arms around

KC and restraining her from running away, and (3) forcing her head toward his pelvic region. While Conley suggests any injuries KC sustained were unintentional during these consensual encounters, KC's testimony contradicts these assertions. The record sufficiently supports the jury's finding that the essential elements of domestic abuse battery existed here on multiple occasions that night. Additionally, Conley, by his own admission, concedes the couple's young children were home and downstairs during this incident. This easily supports the child endangerment enhancement provided under La. R.S. 14:35.3(I), as this statute does not require a child actually witness the abuse, merely that they are "present at the residence" when it occurs.

## Count 2: Second Degree Rape, on or about April 20, 2021.

On this same night, April 20, 2021, KC claimed Conley also forced her to perform oral sex, ripped her clothes off, and vaginally raped her. Second degree rape is defined, in pertinent part, in La. R.S. 14:42.1:

> A. Second degree rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

Conley argues this sexual encounter he had with KC was consensual, providing a far different account of the events on the night of April 20, exemplifying why the jury likely did not find him credible. Conley claims he went to bed with a headache and fell asleep right after KC began taking a bath. A short time later, he awoke to her hand on his stomach, which he interpreted as her initiating oral sex. He went along with it, but his hand

10

became tangled in her hair and an argument ensued between the two of them. Conley also claimed she punched him with her fist. The argument eventually subsided and the couple got in bed together and "spooned" one another, with Conley lovingly hugging KC until they both fell asleep. Around 2:30 the next morning, Conley awoke again, this time to KC pushing her butt against his pelvic region. He then assisted KC in pulling her pants off and positioned himself on top of her as they engaged in consensual vaginal sex. After this, they both went back to sleep.

The jury obviously rejected Conley's version of events and found KC's version credible. Based on KC's testimony, Conley, while making KC perform oral sex, grabbed her head, forced it toward his pelvic region, and held it down. Additionally, while Conley raped KC vaginally, he got on top of her and held her arms down so she could not resist or get away. This conduct by Conley shows he lacked the consent of KC who was prevented from resisting his actions by force, in this case being held down and restrained. In light of these circumstances, we find there was sufficient evidence presented, and a rational trier of fact could have found, the essential elements of second degree rape for both the oral sex and vaginal sex incidents.

_Count 3: Second Degree Rape, on or about February 19, 2020._

Conley was convicted of second degree rape stemming from the incident on February 19, 2020, where KC said she was tied to the coffee table naked, made to wear a leather collar,[5] bound with cuffs, a bag was placed on her head, she was beaten on the vagina with a spoon, as well as by

_____

[5] KC testified that, throughout their marriage, Conley made her go to bed most nights naked wearing a leather collar.

11

Conley's hand, she was choked to the point of losing consciousness,[6] and a butt plug was forced into her anus. Conley concedes he only spanked KC on the butt during this incident but, he asserts, the act was consensual. Conley also claims the couple's sex life became increasingly more kinky following the birth of their first son, and the use of bondage, role play, and outfits was a common consensual occurrence.

As noted above, in order to convict for second degree rape, the state must prove Conley (1) had anal, oral, or vaginal intercourse, (2) without the consent of KC. Here, the record supports that on February 19, 2020, Conley tied KC to a coffee table and, while she was still bound, forced a butt plug into her anus. La. R.S. 14:41 provides that anal sexual intercourse can be accomplished by using any instrumentality to penetrate the victim's anus. Further, this form of intercourse was performed without KC's consent as she was bound to a coffee table while Conley performed this act. Conley claimed this incident was consensual, but KC testified it was not. The jury was free to accept KC's testimony that she was prevented from resisting the acts of Conley by force, in this case being tied down.

In light of these circumstances, we find there was sufficient evidence presented, and a rational trier of fact could have found, the essential elements of second degree rape.

Count 4: Sexual Battery, on or about December 19, 2020.

Conley's conviction for sexual battery stemmed from an incident on December 19, 2020, during which KC claimed she was raped by Conley. For this incident, Conley was originally charged with, and tried for, second

_____

[6] KC claimed this occurred often during their marriage and has left her with constant neck and spine pain.

12

degree rape, but the jury returned a responsive verdict of sexual battery, which is defined, in pertinent part, as follows in La. R.S. 14:43.1:

> A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing, when any of the following occur:
>
> (1) The offender acts without the consent of the victim.

Conley argues there were no specifics provided at trial about the details of this December 19, 2020, incident and denies his involvement; however, the record supports KC testified that Conley grabbed and raped her without consent on this date. During this incident, Conley informed KC that when she was weak, it made him feel strong and more like a man. While KC's testimony supported a finding of second degree rape, the jury was free to return a responsive verdict of sexual battery, which we find is supported by the record.

### Count 5: Second Degree Sexual Battery, on or about December 2019.

Conley's conviction for second degree sexual battery resulted from a December 2019 incident in which KC claimed Conley bit her, pulled her hair, and raped her. Conley argues no specific evidence or facts, other than KC's testimony, were provided relating to this incident, and continually maintains all sexual activity with KC was consensual.

La. R.S. 14:43.2 provides, in pertinent part, the following definition for second degree sexual battery:

> A. Second degree sexual battery is the intentional engaging in any of the following acts with another person when the offender intentionally inflicts serious bodily injury on the victim:

13

(1) The touching of the anus or genitals of the victim by the
    offender using any instrumentality or any part of the
    body of the offender, directly or through clothing.

Relying on this definition, the state must show Conley intentionally touched KC's genitals, and intentionally inflicted serious bodily injury upon her while doing so. Though the record provides limited details of this incident, the testimony of KC indicated Conley bit her, pulled her hair, then ultimately raped her, events that KC said occurred on a frequent basis. This conduct satisfies the essential elements of second degree sexual battery, and there is sufficient evidence in the record to support this conviction.

*Count 6: Aggravated Second Degree Battery, on or about February 2019, August 2019, and February 19, 2020.*

The amended indictment for count six, aggravated second degree battery, provides three possible dates when this crime could have occurred, February 2019, August 2019, and February 19, 2020. The evidence presented at trial supported a conviction for any of these dates. In brief before this Court, Conley addresses both the February 2019 and August 2019 incidents, while the state only addresses the incident of February 2019. Considering the amended bill of indictment curiously provides three separate dates to support only one count, we will address whether the evidence supports that the essential elements have been provided for each separate date.

La. R.S. 14:34.7 provides the following definition, in pertinent part, for aggravated second degree battery:

A. Aggravated second degree battery is battery committed
   with a dangerous weapon when the offender intentionally
   inflicts serious bodily injury.

14

La. R.S. 14:2(A)(3) provides the definition for a dangerous weapon:

> "Dangerous weapon" includes any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.

There is sufficient evidence, through KC's testimony, to support Conley battered KC with a dangerous weapon, with the intent to inflict serious bodily injury, when he beat her ten times with a belt in February 2019, carved an "A" into her back with a knife in August of 2019, and struck her vagina with a spoon on February 19, 2020.

In February 2019, Conley lashed KC ten different times on the back with multiple belts, one of which had rhinestones embedded in it. During this beating, the rhinestones on the belt shattered sending shards of glass throughout the room. KC was left severely cut and bruised, with blood covering the bed and sheets where she was lying.

In the August 2019 incident, Conley used an X-acto knife to carve the letter "A" into KC's lower back. Even though the pain was intense, KC was not allowed to scream due to threats by Conley he would cut her more if she resisted, so she bit down on a towel placed in her mouth.[7] A photograph admitted into evidence clearly shows the "A" on her back, and the jury was shown KC's back with this letter carved into it. Conley astonishingly implied KC carved this "A" into her own back as he found her one day in the bathroom biting a towel and bleeding from the mark.

While the February 19, 2020, incident included second degree rape when Conley placed a butt plug in KC's anus, it also included placing a bag over her head and beating her vagina with a spoon.

---

[7] KC testified Conley would also frequently place a bit in her mouth while he abused her so she would not scream or make noises.

15

Any, and all three, of these incidents easily fit the definition of aggravated second degree battery, that Conley used a dangerous weapon to intentionally inflict serious bodily injury, providing sufficient evidence to support this conviction.

*Sufficiency Conclusion*

In addition to testifying that all of their sexual encounters were consensual, Conley introduced a series of photographs graphically depicting KC, arguing they supported his position that his wife was actually the sexually deviant one, with many sexual fetishes. Conley claimed KC was an exhibitionist and would send him titillating pictures she had taken of herself while he was at work. Some of these images showed KC in extremely revealing clothing. Others showed her mostly naked wearing nothing but various sexually explicit outfits, several depicting her as "catwoman," and, in many images, she was completely naked in provocative poses. KC admitted she had taken some of these pictures herself, but that Conley wanted her to, and that he had also taken many of them. KC explained she would sometimes send pictures to Conley at work so he would not be angry at her when he got home.

It was argued at trial that KC either suffered untold torment at the hands of Conley, or is a liar. The jury obviously believed KC. Though Conley's testimony recounting all of his convictions largely conflicts with that of KC, as stated in *State v. Smith*, *supra*, this Court does not assess credibility or reweigh the evidence. Instead, the trier of fact makes credibility determinations and may accept or reject the testimony of any of the witnesses, *State v. Casey*, *supra*, and the sole testimony of a sexual assault victim is sufficient to support a requisite factual finding, *State v.*

16

*Moody*, *supra*; *see also*: *State v. Brooks, supra*; *State v. Steines*, *supra*. In light of these holdings, it was up to the jury to weigh the testimony of KC against that of Conley and determine credibility. The jury did so and obviously found KC to be credible, rejecting Conley's testimony. The trial court at sentencing also noted it found KC to be extremely credible, with Conley lacking any credibility at all. We find no internal contradiction with KC's testimony, nor any irreconcilable conflict with the physical evidence admitted. In fact, the state introduced photographs supporting her testimony, depicting some of KC's bruises, cuts, and carvings at the hands of Conley.

The victimization of KC by her own husband is unfathomable. Conley stripped his wife of her very human dignity. By his threats, lies, abuse, and dominance, Conley reduced KC to an object for his own pleasure in a cesspool of violence, sexual deviance, and debauchery. Marriage should be a safe harbor from such terror, where the couple gives themselves freely to one another in sacrificial love, not a chamber of horrors where one spouse becomes enslaved to the dominion of the other.

After thoroughly reviewing each of Conley's convictions, and reviewing all of the evidence presented in the light most favorable to the prosecution, we conclude there was sufficient evidence upon which the jury could find beyond a reasonable doubt each essential element for all six of the crimes for which Conley was convicted.

This assignment of error is without merit.

### *Exclusion of Witnesses*

In his second assignment of error, Conley argues the trial court erred in barring two of his witnesses from testifying. Raven, the oldest daughter of Conley from a previous relationship, and Makara Jones, a close family

friend of the Conleys' who frequently visited and stayed in their home, were sworn and placed under the rule of sequestration prior to commencement of trial. It was discovered they were present in the courtroom during a portion of the state's opening statement because defense counsel had advised them they could be present. The trial court did find defense counsel to be in direct contempt of court for encouraging violation of the rule of sequestration, but initially ruled the witnesses could still testify. The state then objected on the grounds the defense did not provide notification that Raven and Makara would be called as witnesses, even though Conley had filed a motion, pursuant to La. C. Cr. P. art. 717, which then required such disclosure. After a review of the record, the trial court found this to be true and excluded both witnesses from testifying.

Before the defense rested, another incident occurred with these two potential witnesses when the state discovered Conley had been calling both Raven and Makara frequently from the jail at night during the course of trial. A recording of the conversations was played in which it appeared Conley was trying to influence testimony, and he also asked one of them to acquire a "Go Phone" so he could continue contacting them. After hearing the recordings, the trial court gave this as an additional reason for excluding Raven and Makara as witnesses.

Conley argues the state had ample knowledge of his intention to call Raven and Makara as witnesses and was provided copies of their subpoena letters. He claims the state faced no prejudice if they were allowed to testify. On the other hand, the state argues the witnesses were not properly disclosed pursuant to La. C. Cr. P. art. 725.1. The state claims this, coupled with the witnesses' presence in the courtroom during opening statements,

18

and Conley repeatedly contacting them by phone from jail during the course of trial, was sufficient to disqualify both as witnesses.

> La. C. Cr. P. art. 725.1 provides, in pertinent part:
>
> A. If the defendant moves, pursuant to Article 717 of this Code, for disclosure of the records of arrests and convictions of witnesses to be called by the state in its case in chief, the defendant shall disclose to the district attorney, prior to those witnesses being sworn, the name and date of birth of the witnesses to be called by the defendant in his case in chief.

Conley filed a motion and order for discovery requesting the state provide the arrest and conviction history of any witnesses the state intended to call at trial. As such, after this filing, Conley was required to disclose the names and dates of birth of any witnesses he intended to call, pursuant to Art. 725.1. Our review of the record indicates he failed to do so, as no witnesses list was furnished and no witnesses names or dates of birth were provided.

> La. C. Cr. P. art. 729.5 provides, in pertinent part:
>
> A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.

Under this article, the trial court has the discretion to issue an appropriate order when a party fails to comply with discovery. Here, since Conley failed to adhere to the provisions of Art. 725.1, the trial court had the authority to order Raven and Makara to be excluded as witnesses. We do not need to address the issue of whether it was an abuse of discretion to bar these witnesses from testifying on this basis only, as there were additional reasons to justify not allowing them to testify.

Raven and Makara violated the rule of sequestration for being present in the courtroom during opening statements, and for having frequent telephone contact with Conley during the course of trial. The sequestration rule is contained in La. C.E. art. 615:

A. As a matter of right. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion.

\*\*\*

C. Violation of exclusion order. A court may impose appropriate sanctions for violations of its exclusion order including contempt, appropriate instructions to the jury, or when such sanctions are insufficient, disqualification of the witness.

The purpose of sequestration is to assure a witness will testify as to his own knowledge. *State v. Brown*, 18-01999 (La. 9/30/21), 330 So. 3d 199, 232, *cert. denied*, 142 S. Ct. 1702, 212 L. Ed. 2d 596 (2022); *State v. Trahan*, 576 So. 2d 1 (La. 1990). A primary purpose underlying the rule of sequestration is to prevent the fact witnesses from being influenced by prior testimony. *Cory v. Cory*, 43,447 (La. App. 2 Cir. 8/13/08), 989 So. 2d 855; *Trejo v. Canaan Constr., LLC*, 52,697 (La. App. 2 Cir. 6/26/19), 277 So. 3d 499. The particular remedy imposed for sequestration violations rests within the sound discretion of the trial court. *Trejo v. Canaan Constr., LLC*, *Id.*

Though they were in the courtroom on the advice of defense counsel, Raven and Makara had already been sworn and sequestered as witnesses by the court. As such, they were not allowed to be present in the courtroom during proceedings pursuant to Art. 615(A), and their presence during opening statements violated the rule of sequestration. The trial court did not

20

bar these two witnesses from testifying on this basis alone, as their presence in the courtroom was brief.

Most significantly, however, Conley contacted Raven and Makara and spoke with them from jail on multiple occasions during the course of trial in an attempt to influence testimony, a clear violation of the rule of sequestration. Included in the list of actions a trial court may take when a witness violates the rule of sequestration, found in Art. 615(C), is disqualification of the witness. As noted by this Court in *Trejo v. Canaan Constr., LLC*, Comment (f) to this statute explains disqualification is the most drastic remedy. In light of our holding in *Trejo v. Canaan Constr., LLC*, and the provisions of Art. 615(C), the trial court had the discretion to exclude Raven and Makara as witnesses.

Conley's contacting Raven and Makara, who both freely and frequently spoke with him, is a substantial and justifiable ground for barring their testimony. This egregious behavior was initiated by the defendant himself, attempting to influence these witnesses. While their brief time in the courtroom during opening statements, or the failure to list Raven and Makara as witnesses, each standing alone, may not have been enough to disqualify them as witnesses, those incidents, coupled with repeated jailhouse contact during the course of trial with Conley, provides a more than adequate basis for disqualification.

Despite being excluded as witnesses, the testimony of Raven and Makara was proffered by defense counsel and made part of this record. We have thoroughly reviewed this testimony and find it would not have changed the outcome of this case, even if it had been included. This proffer generally set forth that Raven observed KC and Conley arguing, but never observed

21

them engaging in physical altercations. Both Raven and Makara stated they never heard any of the interactions between KC and Conley in the upstairs portion of the house, and they both believed KC and Conley got along well as they observed them showing affection toward each other on multiple occasions. Raven also observed KC dressing inappropriately at times and, on one occasion, watching "Fifty Shades of Grey," a movie with strong sexually explicit content. Further, neither Raven nor Makara ever observed KC with any injuries or markings.

On the other hand, KC testified the abuse she endured occurred either while the children were gone from the house, or while they were sleeping. KC also stated she would conceal any bruises or black eyes she had with makeup or glasses, so the children and others would not have seen it. KC conceded she would sometimes wear revealing and inappropriate clothing, but only because Conley made her do it. KC did deny watching the movie "Fifty Shades of Grey."

Our review of the record, and the applicable law, indicates Raven and Makara were properly excluded as witnesses. Even if their testimony had been included, we do not find it would have been substantial enough to have changed the results. This assignment of error lacks merit.

### Excessive Sentence

In his third assignment of error, Conley argues his 95-year total sentence is excessive. Conley, who was 52 years old at the time of trial, emphasizes he essentially received a life sentence. Conley claims he suffered from PTSD, only has one prior misdemeanor conviction, for domestic abuse battery, and contends his service to the community as a fire chief, an EMT, and in the military was not considered. He also states there

22

were no allegations he harmed his children and that he was very involved in their lives.

A reviewing court applies a two-prong test to determine whether a sentence is excessive. First, we examine the record to see if the trial court used the criteria set forth in La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects adequate consideration of the guidelines of the article. *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. Boehm*, 51,229 (La. App. 2 Cir. 4/5/17), 217 So. 3d 596. The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence. La. C. Cr. P. art. 894.1 (C). The goal of Art. 894.1 is an articulation of the factual basis for the sentence, not simply a mechanical compliance with its provisions. *State v. Lanclos*, 419 So. 2d 475 (La. 1982).

When a defendant fails to timely file a motion to reconsider sentence, the appellate court's review of the sentence is limited to a bare claim of constitutional excessiveness. *State v. Benson*, 53,578 (La. App. 2 Cir. 11/10/20), 305 So. 3d 135. Here, Conley did not make an oral request to reconsider sentence at the sentencing hearing, nor did he file a written motion. Therefore, he did not preserve whether the trial court complied with La. C. Cr. P. art. 894.1, and thus, our review is limited to whether or not Conley's sentence is constitutionally excessive. *State v. Dickerson*, 55,088 (La. App. 2 Cir. 6/28/23) 367 So. 3d 958; *State v. Cooksey*, 53,660 (La. App. 2 Cir. 5/26/21), 316 So. 3d 1284*, writ denied*, 21-00901 (La. 10/12/21), 325 So. 3d 1074. We do note the trial court more than adequately considered the provisions of Art 894.1 and provided an extremely thorough account of its applications of these provisions to the facts of Conley's case.

A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering, *State v. Dorthey*, 623 So. 2d 1276 (La. 1993). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166. A trial court has wide discretion to sentence within the statutory limits; absent a showing of manifest abuse of that discretion, such a sentence will not be set aside as excessive. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Fruge*, 14-1172 (La. 10/14/15), 179 So. 3d 579. The sentencing court is not limited to considering only prior convictions and may review all evidence of prior criminal activity, including evidence that would otherwise be inadmissible at trial, e.g., prior arrests, hearsay evidence of suspected criminal acts, conviction records, and evidence of uncharged or nol prossed offenses. *State v. Washington*, 414 So. 2d 313 (La. 1982); *State v. Dale*, 53,736 (La. App. 2 Cir. 1/13/21), 309 So. 3d 1031, and citations therein. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116; *State v. Bell*, 53,712 (La. App. 2 Cir. 1/13/21), 310 So. 3d 307.

Conley was convicted of all six counts he faced, five as charged, and one responsively to sexual battery. The sentencing guidelines for each, and the sentences given by the trial court, are as follows.

Count 1: Domestic Abuse Battery-Child Endangerment, La. R.S. 14:35.3, provides a range of 30 days to six months, with an additional three-year hard labor maximum for child endangerment.

For the domestic abuse battery portion of his conviction, Conley was sentenced to the six-month maximum in the parish jail, to run concurrently with a three-year maximum hard labor sentence for the child endangerment enhancement. Both of these sentences were set to run consecutively with his other sentences.

Count 2: Second Degree Rape, La. R.S. 14:42.1, provides a range of 5 to 40 years at hard labor. Conley was sentenced to 30 years at hard labor, without benefits.

Count 3: Second Degree Rape occurring on or about February 19, 2020, La. R.S. 14:42.1, provides range of 5 to 40 years at hard labor. Conley was sentenced to 30 years at hard labor, without benefits.

Count 4: Sexual Battery, La. R.S. 14:43.1, provides a maximum of 10 years at hard labor. Conley was sentenced to 8 years at hard labor, without benefits.

Count 5: Second Degree Sexual Battery, La. R.S. 14:43.2, provides a maximum of 15 years at hard labor. Conley was sentenced to 12 years at hard labor, without benefits.

Count 6: Aggravated Second Degree Battery, La. R.S. 14:34.7, provides a maximum of 15 years at hard labor. Conley was sentenced to 12 years at hard labor.

For these five convictions, each sentence was set to run consecutively. Conley's full sentence for all convictions totaled 95 years at hard labor, 80 years to be served without benefits.

Our review of the trial court's compliance with La. C. Cr. P. art. 894.1 is not required because no motion to reconsider sentence was filed; nevertheless, the trial court's thorough review of Art. 894.1 is helpful in assessing whether these sentences are constitutionally excessive. The trial court listed its multitude of findings: (1) there was an undue risk that if Conley was not incarcerated he would commit another crime; (2) Conley

25

was in need of a custodial environment; (3) a lesser sentence would deprecate and make a mockery of the seriousness of the Conley's crimes; (4) Conley's actions during the commissions of the crimes manifested deliberate cruelty toward KC, specifically the beatings of her genitals, back, and buttocks, as well as carving an "A" into her back, all extremely vicious actions that were an obvious use of violence; (5) Conley used his position/status to facilitate the commission of the offenses and to cover them up; (6) Conley showed no remorse for his actions so there was no chance for rehabilitation; (7) there was no provocation that caused Conley to commit these crimes; (8) Conley had a history of violence, including a previous simple battery conviction which he did not inform the trial court of during sentencing; (9) Conley allegedly suffered from PTSD, but this factor is outweighed by the gravity of the offenses and their vicious and heinous nature; (10) Conley constitutes an unusual risk of danger to the public in that he might reoffend; (11) Conley was physically dominating over KC; (12) KC's children must go through life without their father and KC's relatives will face the challenge of helping her raise the children; (13) evidence introduced at trial indicated Conley engaged in behavior during trial that obstructed the trial process by contacting his children in an obvious attempt to influence their testimony; (14) Conley was given leniency when the state dropped two of his charges, and by the jury with respect to their responsive verdict on one charge; (15) the behavior of Conley was particularly reprehensible and his crimes were some of the most egregious possible.

Next, the court noted its consideration of whether the sentences should run concurrently or consecutively in light of La. C. Cr. P. art. 883 and *State v. Allen*, 52,318 (La. App. 2 Cir. 11/14/18), 260 So. 3d 703. The court

concluded Conley's sentences should be served consecutively and gave the following two reasons: (1) Conley was not engaged in one course of conduct but, on each count, he made the conscious decision to commit the offense; and (2) if not consecutive, the sentences would fail to consider the heinous and egregious nature of each of the separate offenses.

Pursuant to La. C. Cr. P. art. 883, when two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. However, concurrent sentences arising out of a single course of conduct are not mandatory, and consecutive sentences are not necessarily excessive. *State v. Green*, 54,955 (La. App. 2 Cir. 4/5/23), 361 So. 3d 546; *State v. Dale*, *supra*. It is within the trial court's discretion to make sentences consecutive rather than concurrent. *State v. Green*, *supra*; *State v. Dale*, *supra*.

We find Conley's sentences are not excessive in light of the factors considered by the trial court, and the particularly heinous nature of Conley's crimes, his prolonged and reprehensible abuse of KC, and his lack of remorse for his actions. The record supports Conley intentionally and repeatedly abused and terrorized KC, both physically and sexually, for most of their ten-year marriage. Conley used violence and threats in order to control KC and force her into performing deviant acts for him, including binding herself, dressing in revealing outfits, role playing, and performing numerous sexual acts stripping her of human dignity and reducing her to an object for his own pleasure. Further, Conley perpetrated this lewd conduct even though multiple minor children were present in his home.

27

Despite his despicable behavior, and facing six different serious criminal convictions, Conley still did not accept responsibility for his actions or express any remorse toward his victim at the sentencing hearing. Instead, Conley maintained that he was innocent, claiming KC is the sexually deviant one and he acquiesced only to satisfy her desires, making himself out to be the victim.

Conley's abominable conduct justifies the 95-year total sentence imposed. Though this is essentially a life sentence for Conley, and though the trial court may have accomplished this same purpose with a lesser sentence, it is still the trial court who is in the best position to determine the sentence and we cannot overturn a sentence absent a clear abuse of discretion. Here we find there is none. Though it makes no meaningful difference, we do note that, except for domestic abuse battery-child endangerment, none of the sentences imposed were the maximum under the statute.

Further, as emphasized by this Court in *State v. Green*, *supra*, and *State v. Dale*, *supra*, it was well within the trial court's discretion to impose these sentences consecutively. As noted above, the trial court provided multiple factors and considerations it contemplated while imposing Conley's sentences. The trial court also properly pointed out Conley's numerous convictions did not arise from one course of criminal conduct. As evidenced by the record, Conley repeatedly abused and raped KC over the course of years. Conley's habitual, dominating, and reprehensible conduct provide an adequate basis to support consecutive sentences.

We find the 95-year total sentence does not shock the sense of justice, and is not a needless infliction of pain and suffering.

This assignment of error lacks merit.

## CONCLUSION

For the reasons expressed, we affirm all of Conley's convictions and sentences.

**AFFIRMED.**